May it please the court, my name is Kevin Crabtree and I represent petitioner Juan Mendoza-Pablo. The agency erroneously concluded the petitioner did not suffer past persecution where he was subjected to deprivation and traumas during his childhood and where he learned later that various family members had been horrifically murdered by the Guatemalan military due to ethnicity and their political opinions. The agency also erred in requiring as a litmus test the production of expert testimony on psychological harms when it routinely has considered Did they really require that or did they simply say that his evidence, which was on its face not sufficient, was not further corroborated by expert testimony? I think the agency inquired only whether he had a presently existing psychological condition and it failed to consider his description of the subjective impact on him during his childhood of stories that he heard of this violence to family. The agency in matter of Chen similarly referenced the petitioner, the applicant's description of his suicidality and anxiety because of experiences, but no reference was made to a psychological evaluation. So I think in this case it did impose such a requirement because it looked only to the current psychological state of the petitioner and not to the consequences for him as a 5, 6, 7-year-old child hearing that his family had been horrifically murdered. The petitioner asked that the court recognize, well, in Hernandez-Ortiz, which we assert controls here, the court found that two things, that the quantum of harm necessary for showing a persecution to his child is lower than an adult and that the harms perceived during childhood to a family must be considered in the past persecution analysis. But it also found this was based on common sense and it cited the favorablest decisions such as Jorge's talk from the Second Circuit. We asked the court to identify that there are actually three forms, at least three forms of harm to a child when a family is persecuted. One is the one identified by the board here, which is if a child witnesses harm to a family. Ginsburg-Gilmour-Ross That he didn't witness harm. That's correct, Your Honor. So that is just one form of harm. But in Hernandez-Ortiz, this Court also recognized that a child may suffer emotional harms upon learning of harm to a family because of the fear that that engenders in a child. And even adults, this Court has found in cases like Ndonke-Gonzalez or Ashcroft, excuse me, that the terror engendered in a person because of a hearing of the similarly situated persons may have been suffered horrific torture. Ginsburg-Gilmour-Ross Did any of those cases involve a child who was not even born when the persecution occurred? They did not, Your Honor, but we assert that the persecution occurred when the child was 5, the Petitioner here was 5, 6 or 7. The Petitioner in Hernandez-Ortiz also learned while in Mexico that the Guatemalan military had killed a brother. And so these harms were transmitted indirectly through communication, but they were no less serious for a child of that young age. Further, there is another important type of harm that I think in this case raises perhaps is the most direct harm to this Petitioner. It's the nutritional deprivation that he suffered. There is a form of harm where a child, because of the unique dependence upon adults, is actually directly harmed. There is a reasonably foreseeable consequence of, say, killing a parent. Counsel, I take it that you think your strongest case is Hernandez-Ortiz? I do believe that. So, okay, will you point me to the language in Hernandez-Ortiz that you say supports your argument that learning of events that happened before the Petitioner was even born is sufficient to establish past persecution? The language of the case, Your Honor, the rule as stated is that harms, and I'm paraphrasing, I'm sorry I don't have the case right in front of me, but it does say that harms that are perceived by the child, harms to the family that are perceived by the child during childhood, must be considered. Right. But in those cases, the children were alive when the harms occurred. That's true, and we're not asserting that the fetus suffered persecution, Your Honor. We're asserting that the Petitioner as a child suffered persecution. And the question is what does perception mean? We also think that to the extent Hernandez-Ortiz is not directly controlling, the Court should take this opportunity to expand using the common-sense principles that underlie it. Can we do that with the standard of review that we have for, in a Petition for Review context? You can, Your Honor, because this, the agency's decision is not supported by substantial evidence. The Court reviews the record as a whole, and I would refer the Court to evidence in record that similarly situated persons have, do suffer psychological consequences due to exposure to war trauma. The, in particular, at Administrative Record page 176, 186, and 190, particularly 176, there is a research study, which was completely ignored by the agency, which found that children who were exposed to war violence, even minimal amounts of war violence, commonly suffer cognitive deficits. And what's very interesting is that they compared, say, a very relatively minimal amount of exposure, like hearing about a third party, nonrelative suffering harm, versus directly witnessing the harm to a family member, and found that the cognitive deficits were equal in severity. So the attempted distinction in this case that the agency is making by saying, well, there must be direct, you must be a percipient witness in order to have suffered persecution, is not supported by the evidence in the record. This Court has turned to articles like this in cases such as Hernandez-Montiel to find that, for example, in that case the Court cited an article from the Journal of the American Medical Association about the common psychological consequences of rape. Here, the Petitioner asserts that, asks the Court to find that cognitive deficits in children are a common consequence of exposure to war violence, either directly or indirectly. The reasoning of Hernandez-Ortiz is one of common sense, and common sense dictates that children, there are reasons, for example, that ratings exist on movies. It's a common sense principle. Children are harmed by being made aware of horrific violence. And I would remind the Court, in this case, that the Petitioner was informed that all four grandparents and two of his aunts were burned alive by the Guatemalan military. The evidence in the record- Of course, we're a court of law, so common sense is totally foreign to us. If I may shift gears a minute to your point about not being given an adjournment to get a psychological test, there's vague reference to monetary constraints or things like that. Was that fleshed out at all? The motion was unopposed, and the statement of its was very brief, which is consistent with practice in the immigration courts, Your Honor. I would point out that it's come to my attention, the Petitioner cited Baudoin v. Gonzales, a Sixth Circuit case, which addresses when it's appropriate for the agency to deny an unopposed motion to continue. This reasoning is recently adopted by this Court and by the Board. The agency's decision in this matter is not consistent with current practice. In matter of Hashimi, the Board found that an unopposed motion to continue should be granted by an I.J. in the absence of, quote, unusual, clearly identified and supported reasons for not doing so. But isn't timing a factor in this case? I mean, the Petitioner had had literally years to get this information gathered, and the request was made on the eve of the hearing that had been delayed for, I think, two years? I would make two observations. One is that in Bears v. INS, the agency based the denial of the continuance solely on the four-day lapse between filing of the motion in the hearing and on the needs for expeditiousness. That was the exact basis here, and the Court reversed the agency in Bears. Secondly, the Petitioner was not at fault. A close review of the record shows that the first continuance was to a sponte by the I.J. He insisted on continuing without counsel. The I.J. refused to continue the matter. He appeared with counsel at the next hearing. She requested a continuance of 60 days for a four-year request. This Court has recently held in Dent v. Holder. The Petitioner has a right to a copy of his A file. That was an agency delay. The third hearing, the I.J. on the day of the hearing, granted the withdrawal of prior counsel. The Petitioner requested 60 days for counsel. He returned with counsel. It was an unopposed motion. And then at that hearing, the present counsel entered pleadings to the NTA. We scheduled a hearing. The I.J.'s sui sponte continued the matter two times after that. One, without excuses. The point is that that gave the Petitioner plenty of time to procure whatever information or evidence was needed to prove his case. There was a significant amount of time, but the agency did not analyze why economic reasons were not a good justification. In Malelia v. Holder, the case referencing the matter of Hashimi, this Court noted that agency delays, for example, are common. And so it was inappropriate under the Board's standard of unusualness to deny a motion to continue. It's very common, unfortunately, for Petitioners like this uneducated, completely uneducated, illiterate, monolingual, Guatemalan, indigenous Petitioner who has no work authorization in the United States to be faced with these realities. It was also, I don't know, hinted in the record, although not completely clear, that part of the reason for the delay was, I think, what's called monetary consideration. In other words, he couldn't afford to hire the expert, right? Is that part of his excuse? That is part of the excuse, Your Honor. But why would that change? The – because under Malelia, the Court identified that it's an unopposed motion. This was unopposed. No, no, I mean, why would his economic situation be any different six months later? I – it's speculative. I can't really address that issue, Your Honor. I'm sorry. But the – but I do know that without the continuance, there was no chance of presenting that testimony. Thank you very much. All right. Thank you, counsel. You've exceeded your time. We'll give you a minute for rebuttal. Thank you. We'll hear from the government. May it please the Court, my name is Elizabeth Curlin, and I represent the United States Attorney General, who is the Respondent in this case. Before I address the issue of the agency's denial of the continuance, I would like to point out that the Board in this case ultimately concluded that you cannot base an asylum claim on events that occurred before you were born. Petitioner, was that the case? Well, did all the – all the persecution-type events occur before he was born, or just some of them? Well, the events that formed the basis, which is his allegation that the Guatemalan military murdered his extended family and burned down his village, is the – are the exact – are the specific events that formed the basis of his claim. Now, what he's claiming is, even though he was never targeted by the Guatemalan military, because they didn't know him, and because he didn't exist at the time, and he doesn't have any personal knowledge of the events, his claimed emotional pain is a collateral consequence of his mother's experiences. And because – But I think there is testimony that some of this persecution-type conduct continued after he was born and after they returned to that village, right? No, Your Honor. They did not return to the village. What happened was that his mother was pregnant with him at the time. She – his parents went, and his family hid in the mountains. And then his extended family came back to the village, and that's when they were murdered. And his parents, his mother and father, stayed there when she – and she gave – his mother gave birth to him in the mountains after the events had finished. And he – as a result of that, he was malnourished. He didn't get enough food to eat, and – but his mother still managed to feed him. And then when he was three months old, his family fled to Mexico, and that's where they resided for most of the time. So his – and it wasn't until he was old enough to learn about these stories that he learned about them through his mother and how she related them. Assuming the accuracy of the stories, which I think we have to, because he was found credible. If, for example – not this case, but if, for example, a terrorist organization said, we as an act of terrorism are going to kill all the parents, all the adults in this village who have children that are yet – who – where the mother is pregnant, and we'll – we're going to leave them either dead or, if they're born, they will be orphans, and that will be – cast fear and terror into everyone involved. And you're saying that the – in that situation, the fact that the child who was, in effect, a victim of this terrorism but didn't know about it because he or she was still a fetus or whatever, would not have a claim? It – we would say yes, Your Honor, because the board found that – Why? What – what's the reason for that? Because the idea of our asylum laws are that the person has to have – be able to show that he was persecuted in some way. Now, if an individual doesn't exist at the time, what the board recognizes is – Suppose the persecutor, say, murders the entire family, the entire village, and this one person survives, all right, or, say, born afterwards. Doesn't the persecution directly affect this person? I mean, isn't – isn't that person the victim of persecution? No, Your Honor. The person's parent who survived the attack is the – is the victim of the persecution. What the board recognizes – But so is a child that's born, you know, to a – you know, up in the mountains because the village is burned down. Don't you think the child is also a victim of persecution? But again, Your Honor, what the board found is that this is – the board recognized that this is what is known as a collateral consequence or a second-hand exposure to war. Well, that's putting a leg wire. But that's assuming the answer. That's the question, though. Is it just the collateral consequences, or is this person a direct victim of persecution? Well, what this person is suffering is what the board recognized was second-hand exposure to war, because he was not – he was three months old when his parents left and went to Mexico. And however sad his life must have been as an undocumented immigrant in Mexico or, for that matter, anywhere else in the world, that is simply not a basis for a claim of asylum when he has no personal knowledge. No, but the question is why he had to flee to Mexico, he and his family. And that's a result of – and that's a result of persecution, right? Of his family, of his – that might be the result of persecution of his mother or his father. But he's part of the family. That's the problem with your response, is he is part of the family. So you're discounting him as part of the unit that's being persecuted. No, Your Honor. We're not discounting that he's part of the family. We're recognizing that he's part of the family and that he grew up hearing these stories. But what we're saying is that – But before the stories happened, when they were in the mountains, if the army were pursuing everyone in his family, and he's a three-month-old baby, is he a victim of persecution or not? It depends, because as this Court found in Hernandez-Ortiz, the child, in order to make a claim of persecution based on his family experiences, has to have the seat  If they were persecuting counsel. Yes, Your Honor. If they are – if they are seeking the entire family. Yes. Including the three-month-old child. Are you saying he's not a victim of persecution just because he's only three months old? He might be if they were seeking to harm him, yes. If they were still seeking to harm him, yes. But in this case, they were not. And the only event – Supposing – supposing you had a situation where they stood all the members of the family up against a wall and they said, we're going to at random kill four out of five. One of you will survive. You're saying that fifth one is not persecuted in that situation? Of course that fifth one would be persecuted if that person were alive at that time, Your Honor. But again – But – but it's collateral to – he's not the one being – they've said we're only going to do four out of five, and he's the lucky one. Why isn't that, under your view, quote, collateral? Well, Your Honor, what I meant by collateral is the idea that what he is – what he has perceived of the events are relegated through someone who was there at that time, because he didn't exist at that time. And that's why I term it collateral. I don't mean collateral in terms of the persecutor wasn't specifically directing it at him. What I meant by collateral is that in – especially in this – particularly in this case, he's claiming that as a consequence of hearing these stories, not of having actually suffered it, but as of hearing it, that that constitutes persecution. And I would say that no court has ever held that an individual can claim asylum based on events that occurred before he even existed, because the alleged persecutor in this case couldn't have targeted him for any reason, because they didn't even know about him. So what he's saying is that he – and he even admits, I have no knowledge of this. I don't know anything about it. I have no personal knowledge. I don't even remember any of these events. But what happened was I feel I have manifested some sort of emotional harm because my mother was very sad, because we lived this hard life as undocumented immigrants, because we had to escape. The supposing – I mean, that brings us to the continuance question. Yes, Your Honor. A psychologist might have said that this was a more severe kind of post-traumatic syndrome type of situation. But the IJ didn't have the benefit of that. The BIA didn't have the benefit of that, because this continuance, though unopposed by the government, was denied. Why wasn't that an abuse of discretion? It's not an abuse of discretion, Your Honor, because in looking at the circumstances of his request of the continuance, Petitioner alleged that Petitioner submitted four days before the merits hearing that he was going to – that scheduling and monetary constraints. He made a perfunctory request saying that scheduling and monetary constraints prevented him – required that he needed more time to produce a psychological report, and the IJ denied that motion because he had not established good cause. Now, keeping in mind this is what happened, Petitioner had been – had I know all that. The difference, perhaps, is that here he's asking for a continuance for the very specific purpose of getting a psychologist in a situation where if he's going to carry his burden, the psychologist may be critical. And he's saying – he isn't saying he hasn't tried. He's saying that, among other things, for lack of money he hasn't been able to quite do it. Unless I'm wrong, the IJ didn't say, well, tell me more about your situation, let's find out, you know, can this be done in two weeks, can it be done in a month? I'm not willing to give a continuance forever, but, you know, let's find out what the facts are. The IJ just said denied. Yes? No, Your Honor. What Petitioner – it was Petitioner's burden to prove that he had established a basis for asking for the continuance, and in this case he perfunctorily asserted that monetary and scheduling constraints prevented him from doing so. I understand it, but, of course, initially he probably thought he was going to get it because, A, there had been lots of adjournments for much more trivial reasons, B, the government didn't oppose. So my question is, after he makes this admittedly perfunctory assertion and the government says, fine with us, what happens then? What does the IJ do at that point? Well, after the IJ found no good cause, one day before the actual – And I'm saying, did the IJ make any further inquiry or just say no? No. The IJ said no because no good cause. And this Court in Sing recognized that an IJ is not required to – to guess at what could have been or to speculate as to what the evidence would have proven. Well, but here he had given admittedly conclusory, but it wasn't like he had given no reason. The – but he – you're saying he never – after the IJ said that, his counsel didn't say, Judge, can I explain, or, you know, what was it? No. No, Your Honor. In fact, one day before the merits hearing, he submitted a brief where he didn't challenge that determination. I see that I'm out of time, so I'd like to close that in conclusion. A reasonable adjudicator wouldn't be – a court wouldn't be compelled to conclude to the contrary that he had not established his eligibility for asylum. Thank you. Thank you, counsel. Rebuttal. One minute. Thank you. The Petitioner went in the mountains, was fed wild tea made from plants, not his mother's milk, so there was extreme deprivation of nutrition. Regarding the issue of terrorism, the record administrative – page 193 of the record shows that the Guatemalan military engaged in a systematic campaign of psychological warfare that constituted terrorism against its population. We refer the Court to that. The – with respect to the collateral persecution issue, what are the reasonably foreseeable consequences of actions like going into a community and doing this? It's not unheard of for people to flee for their safety to places like the mountain top where they suffer these harms. But, again, in this case, it was – we assert that that was actually the specific intent of the military, because the record contains at page 193 information about tactics such as cutting children into pieces in front of their parents in order to torture the parent, cutting children out of their wombs. So thank you very much. Thank you, counsel. Thank you to both counsel.
judges: Tashima, Rawlinson, Cjj Rakoff (S. New York), Dj